COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| DAVID RAMOS, | | No. 08-09-00279-CR |
| | § | |
| Appellant, | | Appeal from the |
| | § | |
| V. | | 41st Judicial District Court |
| | § | |
| THE STATE OF TEXAS, | | of El Paso County, Texas |
| | § | |
| Appellee. | | (TC# 20070D02843) |
| | § | |
| | § | |

**O P I N I O N**

David Ramos appeals his manslaughter conviction. He was sentenced to 10 years'
imprisonment in the Institutional Division of the Texas Department of Criminal Justice. On
appeal, he raises a single issue challenging the legal sufficiency of the evidence supporting the
conviction.

At 9 p.m., on March 15, 2006, seven-month-old Danielle Ramos was admitted to the
emergency room at El Paso's Del Sol Hospital unconscious and not breathing. She was
pronounced dead at approximately 9:12 p.m. Her death was ruled a homicide by El Paso medical
examiners.

On June 28, 2007, Appellant, Danielle's father, was indicted for causing her death.
Appellant was charged with capital murder (Count I), Felony Murder (Count II), and Injury to a
Child (Count III). All three counts included paragraphs alleging that Appellant caused Danielle's
death by: ("Paragraph A") shaking her with his hand; ("Paragraph B") by shaking her with his

hand, and striking her head against an unknown object; or ("Paragraph C") by shaking Danielle, and striking her head with an unknown object.

Dr. Paul Shrode, the El Paso County Chief Medical Examiner, concluded Danielle's death was the result of an impact injury to her head. He testified at trial that some type of trauma to Danielle's head caused her brain to bleed and swell. Specifically, the examiner identified a contusion, or point of impact, where either an object struck the child's skull, or her head struck an object. On the opposite side of Danielle's brain, Dr. Shrode noted a large amount of blood. He testified that when dealing with brain trauma involving a moving head, a small point of impact on one side of the skull will produce a large contusion on the opposite side. This impact and reaction relationship, referred to as "cu contra cu," indicated that the victim's head was in motion when the impact occurred. Dr. Shrode testified that based on the impact and "cu contra cu" injuries, it is more likely that Danielle's head was in motion when it struck an object, as opposed to an object having struck her skull when her head was stationary.

The autopsy results also indicated additional bleeding between the brain tissue surface and the surrounding subdural tissue layers. Dr. Shrode explained that this subdural bleeding would have irritated the brain tissue and caused the brain itself to swell. The swelling could have caused any number of changes in Danielle's demeanor, including; agitation, fussiness, and crying, or the child could go limp and be generally non-responsive. As the pressure on the brain increased, it eventually disrupted the respiratory drive center causing respiratory distress and failure. Finally, Dr. Shrode also testified that there was blood present outside the blood vessels in Danielle's retinas. Again he concluded this was consistent with head trauma, and was related to the impact to Danielle's skull.

During his testimony, the State presented Dr. Shrode with two hypothetical scenarios to explain the autopsy findings. In the first hypothetical, a child matching Danielle's physical and developmental condition receives a feeding from her father at approximately 6:30 p.m., three hours before her death. The child eats and is placed in her bed laying on her back. Between ninety minutes and two hours later, the child is still in her bed face up, but she's not breathing. She appears pale, her lips are chapped, her pupils are fixed and dilated, and she is cold to the touch. Her parents contact emergency medical services and administer CPR. When the child arrives at the hospital, her body temperature is eighty degrees and she is pronounced dead a short time later. Dr. Shrode testified that this scenario was not consistent with Danielle's injuries.

In the second hypothetical, a child similar to Danielle is in the care of her father while her mother is at work. The baby is fine until mid-day when the father is awakened by her crying. Unable to console the child, the father gets frustrated and shakes the child before throwing the baby down in her crib. The crib has metal components. The baby finally stops crying. Three to three-and-a-half hours later, approximately 3:30 p.m., the father returns to the crib to find the baby non-responsive and not breathing. Saying nothing, the father puts the baby in her carrier and takes her to pick up another family member. The baby is still non-responsive. The family returns home, and the baby is put in a room where she is left for another extended period. When the father returns the baby is still not breathing, is non-responsive and is cold to the touch. When emergency services arrive on the scene, the baby is cold to the touch, and they are unable to find any electrical activity in her heart. There is no respiratory activity. The baby is transported to the hospital while medical staff continues to perform CPR. Hospital staff is unable to revive the child, and her body temperature at intake is less than eighty degrees. Dr. Shrode agreed this

hypothetical was consistent with Danielle's condition at the time of her death.

Detective Enrique Gutierrez interviewed Appellant shortly after Danielle was pronounced dead. The interview was recorded via DVD and admitted into evidence at trial. According to Appellant's initial statement, on the night Danielle died, his wife fed the baby between 6 p.m. and 6:30 p.m. The baby fell asleep on her back in her crib as usual. The couple left Danielle in the care of Appellant's mother and went to do laundry and have dinner. When they returned home between 8 p.m. and 8:30 p.m., Appellant discovered Danielle still in her crib, in the same position as when the family had gone out. When he noticed she was pale and that her lips were chapped, he called for his wife. When he picked her up from her crib, Appellant noticed Danielle was not breathing. His wife called emergency services immediately.

Following the autopsy, Detective Gutierrez began a homicide investigation. During the investigation, the detective located several time-stamped images taken from a restaurant surveillance system showing Appellant and other members of his family, at the restaurant until approximately forty-five minutes before the family called 9-1-1. These photographs were also admitted into evidence at trial.

In June 2006, Appellant was taken into police custody pursuant to an arrest warrant, and gave a second voluntary statement. According to Appellant's second statement, March 15, 2006, was Appellant's day off from work. He was home watching three children; a toddler, a preschooler, and infant Danielle. After dropping off his wife and mother at work, Appellant put the kids back to sleep and fell asleep himself. Danielle was asleep in her bassinette next to Appellant's bed on the floor. When Appellant woke up at 11 a.m, he discovered that one of Danielle's older siblings had taken the baby out of her bassinet and into the living room.

-4-

Appellant recounted that he was angry, but that nothing seemed wrong with Danielle so he put her back to sleep. Appellant went back to bed himself.

Between 11 a.m. and 12 noon, Appellant woke up to the sound of Danielle crying. He picked her up and tried to soothe her, but she continued to cry. Frustrated, and not knowing what to do, Appellant explained that he, "[k]ind of like not intentionally threw her hard. Just threw her on her bassinet to see if she would stop crying." Still, Danielle continued to cry. Eventually Danielle did calm down, and both she and Appellant fell back to sleep. Appellant woke again at 3:30 p.m. so that he could pick his wife and mother up from work. Appellant noticed that Danielle was in a "very deep sleep," was not breathing, and would not respond when he tried to wake her. Appellant also remembered that Danielle's neck moved easily as he shook her to try and wake her.

Appellant told Detective Gutierrez that he realized at that point that something was wrong, and that he was frightened. Still, rather than call for help, Appellant put Danielle in her car seat and took her and the other children with him to pick up his wife and mother from work. When his wife, got into the car, she sat down and put Danielle's car seat on her lap believing the baby was asleep. Appellant did not alert his wife or mother about Danielle's condition.

Back at home, Appellant decided to go into work to "check on some sales and documents and stuff like that." Appellant's wife left with him, and his mother agreed to watch the baby, who still seemed to be sleeping. Still, Appellant did not tell the family about Danielle's condition. When the couple returned home, Appellant talked with his mother for a few minutes, while his wife went to take a shower. When he asked his mother if she checked on Danielle while he and his wife were out, his mother told him that she checked on the baby once, but never

-5-

heard her cry. Appellant, hoping that he would get a reaction, went to check on his daughter. According to his statement:

> Yes, picked her up. Tried to go come on, please, please wake up, please wake up. She wouldn't. And then I ran to my wife. And she was taking a bath, a shower. I just told her, I told her something is wrong with [Danielle], for her to check on [Danielle] and everything. And she could not respond. She didn't respond for nothing. My wife got [Danielle], did CPR, mouth to mouth, everything.

When the detective asked Appellant why he had not explained all this during their first interview on the night Danielle died, Appellant explained, "[i]t was my fault. I wanted something else. Something else."

The jury convicted Appellant of the lesser included offense of manslaughter, and sentenced him to ten years' imprisonment. Appellant timely filed a notice of appeal.

Appellant's only issue is that the evidence is legally insufficient to support the jury's determination: (1) that he acted "recklessly;" or (2) that "shaking" caused Danielle's death. A legal sufficiency review requires the appellate court to determine whether, "[c]onsidering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 899 (Tex.Crim.App. 2010), *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In conducting this review, we must defer to the jury's role as the sole judge of the credibility and weight that testimony is to be afforded. *Id*. at 899.

A person commits the offense of manslaughter if he recklessly causes the death of an individual. TEX.PEN.CODE ANN. § 19.04(a)(West 2011). A person acts "recklessly" when he is aware of, but consciously disregards a substantial and unjustifiable risk. TEX.PEN.CODE ANN. § 6.03(c)(West 2011).

-6-

With regard to Appellant's first argument, Appellant's admission, in his second voluntary statement, that he "threw" Danielle into her crib out of frustration when she would not stop crying, provided a rational basis from which a jury could have concluded that Appellant consciously disregarded the risk of harm that such an action could have on an seven-month-old child. Accordingly, Appellant's first argument is overruled.

In his second argument, Appellant challenges the legal sufficiency of the evidence on the basis that the prosecution failed to prove he committed the offense in the manner in which the offense was alleged to have been committed. That is, the indictment and the jury charge both specified that the criminal offenses were committed in one or more of three ways: (1) shaking; (2) shaking and causing Danielle's head to strike an object; or (3) shaking, and striking Danielle's head with an object.

The sufficiency of the evidence supporting a conviction is measured by the elements of the offense as defined by the hypothetically-correct jury charge. *Malik v. State*, 953 S.W.2d 234, 239-40 (Tex.Crim.App. 1997). A hypothetically-correct jury charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Gollihar v. State*, 46 S.W.3d 243, 256 (Tex.Crim.App. 2001).

In this case, the hypothetically-correct jury charge regarding the manslaughter offense would ask whether Appellant recklessly caused the death of Danielle Ramos. *See* TEX.PEN.CODE ANN. § 6.03(c); *Malik*, 953 S.W.2d at 240. As we discussed in reference to Appellant's first argument, Appellant's admissions in his second voluntary statement provided a basis on which a rational jury could have determined that Appellant acted with conscious

disregard for his daughter's safety, when in his frustration, he forcibly put her back in her crib. In addition, Dr. Shrode's lengthy testimony about the nature of Danielle's head injuries provided a rational basis for the jury to conclude that Appellant's actions, ultimately caused Danielle's death. Accordingly, we overrule Issue One in its entirety.

Having overruled Appellant's sole issue, we affirm the trial court's judgment.


August 24, 2011

DAVID WELLINGTON CHEW, Chief Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)